## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANNIA

KYLE SHOLTIS,

                   *Plaintiff,*

     v.

CITY OF PITTSBURGH, MAG PITT, L.P.
*doing business as* CHEERLEADERS, and
MATTHEW TURKO,

                 *Defendants.*

Civil Action No. 2:19-cv-0332

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

     Plaintiff Kyle Sholtis ("Sholtis") filed this action under 42 U.S.C. § 1983 against Defendants Sergeant Matthew Turko ("Sergeant Turko") and the City of Pittsburgh ("City of Pittsburgh") alleging violations of the Fourth Amendment.[1]  Specifically, in Count I of the Amended Complaint, Sholtis asserts that Sergeant Turko used excessive force by tasing and drive stunning him following an incident at a gentlemen's club in Pittsburgh.  (ECF No. 26, ¶¶ 26–28).  In Count II, Sholtis claims that the City of Pittsburgh has a custom of permitting its police officers to use excessive force against citizens.  (*Id.* ¶¶ 29–44).  The Defendants filed a Motion for Summary Judgment.  (ECF No. 99).  In support of that motion, Sergeant Turko argues that he is entitled to qualified immunity, and the City of Pittsburgh maintains that Sholtis has failed to establish municipal liability.  (ECF No. 100).  For the reasons below, the Motion for Summary

---

[1] Sholtis also brought state-law claims against MAG Pitt, L.P. d/b/a Cheerleaders.  (ECF No. 26, ¶¶ 45–61).  By stipulation of the parties, those claims were voluntarily dismissed with prejudice. (ECF Nos. 53, 55).  The Court exercises subject-matter jurisdiction over the remaining federal claims pursuant to 28 U.S.C. § 1331.

Judgment (ECF No. 99) will be denied in part (as to Count I against Sergeant Turko) and granted in part (as to Count II against the City of Pittsburgh).

## I.   STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## II.   BACKGROUND

Sholtis, a resident of Ohio, traveled to Pittsburgh, Pennsylvania in May 2017 to celebrate his bachelor party. (ECF No. 114-4, pp. 9–10, 17, 21). The celebration came to an abrupt end, however, shortly after 1:00 AM on May 28th following an incident at a gentleman's club called Cheerleaders. That incident was captured by four security cameras, sans audio. (ECF Nos. 104-20, 104-21, 104-22, 114-13). The Court has carefully examined the security footage and "view[s] the facts in the light depicted by the videotape[s]." *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also Jacobs v. Cumberland County*, 8 F.4th 187, 192 (3d Cir. 2021).

At approximately 1:10 AM, Sholtis, his brother, and three other friends arrived at Cheerleaders. (ECF No. 104-22, 10:00). They joined the back of a line of patrons in the lobby, where they chatted and laughed with each other and two women standing ahead of them. (*Id.* at 10:00–13:00). During that time, a bouncer ("Bouncer One") approached the group from the side and checked everyone's identification. (*Id.* at 11:17–11:50). Sholtis's group reached the front desk around 1:13 AM, at which time they paid the club's admission fee and had a short conversation with the front desk clerk. (*Id.* at 13:07–13:50). The line then briefly stalled as another bouncer at the head of the line ("Bouncer Two") scanned the women ahead of Sholtis's group with a hand-held metal detector and searched their bags. (*Id.*; ECF No. 114-13, 0:00–0:20). While waiting, Sholtis continued to chat with the front desk clerk, at one point leaning over the counter and appearing to ask a question while gesturing toward the club entrance with his hand. (ECF No. 104-22, 13:55–14:04). The clerk responded to Sholtis and gestured in the same direction. (*Id.* at 14:00–14:04). According to Sholtis, the front desk clerk said that he could "go ahead and go" since he was the bachelor, and when Sholtis pointed forward and asked, "This way?" the clerk answered affirmatively. (ECF No. 114-4, p. 40).

Sholtis then tried to walk past Bouncer Two through a standing metal detector and into the club at approximately 1:14 AM. (ECF No. 104-22, 14:05; ECF No. 114-13, 0:23). But Bouncer Two placed his arm out and barred Sholtis from entering, instructing Sholtis to get back in line. (ECF No. 104-22, 14:07; ECF No. 114-13, 0:25; ECF No. 114-4, p. 40). Things escalated very quickly from there. Sholtis started to walk back to his place in line, but suddenly turned again to face Bouncer Two with an expression of disbelief—apparently in response to a comment from Bouncer Two "along . . . racial lines" that "caught [him] very much off guard." (ECF No. 104-22, 14:10–14:16; ECF No. 114-13, 0:27–0:33; ECF No. 114-4, pp. 41, 43). As Sholtis and Bouncer

Two exchanged words, Sholtis leaned forward, placing the two men almost nose-to-nose.  (ECF No. 104-22, 14:17–14:23; ECF No. 114-13, 0:34–0:40).  All the while, members of Sholtis's group attempted to intervene.  Sholtis's brother and friend ("Friend One") began pulling Sholtis's shirt and arm, soon persuading him to return to the back of the line.  (ECF No. 104-22, 14:17–14:29).  Friend One then spoke with Bouncer Two, seemingly trying to deescalate the situation.  (*Id.* at 14:29–14:37).  Meanwhile, Sholtis stood at the back of the line with his other friends ("Friend Two" and "Friend Three"), appearing visibly upset and shifting from side-to-side.  (*Id.*).  Sholtis did not hear anyone order him to leave, so he made no move to exit the building.  (ECF No. 114-4, p. 46).  Nor did Sholtis make any further move toward Bouncer Two or the club entrance—at least until additional people arrived in the lobby.

Bouncer One returned, poking his head through the front door from outside.  (ECF No. 104-22, 14:38; ECF No. 104-20, 0:05).  At the same time, a third bouncer ("Bouncer Three") appeared from inside the club and came to stand next to Bouncer Two, who was pointing in Sholtis's direction.  (ECF No. 104-22, 14:38; ECF No. 114-13, 0:51–0:56).  Finally, Sergeant Turko arrived.  He also approached the lobby from inside the club—where he had been performing approved off-duty work for Cheerleaders while in full uniform[2]—and he stopped behind Bouncer Two and Bouncer Three to observe.   (ECF No. 114-13, 0:55–1:00; ECF No. 104-6, p. 2). According to Sergeant Turko, he was alerted about the situation in the lobby by the "screaming front desk [clerk]," and he arrived to find Sholtis's group "screaming obscenities" at the bouncers. (ECF No. 104-6, p. 2; ECF No. 114-7, pp. 80–81).

---

[2] This is also known as "secondary employment," wherein a private entity employs a police officer in full uniform to perform work "conditioned on the actual or potential use of law enforcement powers."  (ECF No. 114-1, pp. 1–2; ECF No. 114-7, pp. 46–49).  All secondary employment details must be approved by the Pittsburgh Bureau of Police, and officers must "conduct themselves as though they were on-duty."  (ECF No. 114-1, p. 2).

The bouncers soon began to converge upon Sholtis. Bouncer Three walked forward first, and Sholtis took a few steps forward to speak with him. (ECF No. 104-22, 14:39–14:42). Bouncer One quickly joined, sandwiching Sholtis between them (with Bouncer Three in front of Sholtis and Bouncer One behind him). (*Id.* at 14:42–14:44). Bouncer Two then came to stand behind Bouncer Three. (*Id.* at 14:44). Within seconds, the interaction turned physical.[3] Sholtis can be seen jerking backwards—either because Bouncer One yanked him from behind or Bouncer Three pushed him from the front, or perhaps a combination of both. (*Id.* at 14:45; ECF No. 104-20, 0:13). Bouncer One wrapped his arms around Sholtis's upper body, and Bouncer Three shoved repeatedly at Sholtis's chest and neck area. (ECF No. 104-22, 14:46–14:48; ECF No. 114-4, p. 45). The two bouncers began dragging Sholtis toward the exit, but Sholtis struggled and flailed his arms. (ECF No. 104-22, 14:48–14:53; ECF No. 104-20, 0:14–0:21). He did not "punch" or "kick" anyone, but rather "tr[ied] to get away from the people who [he believed were] attacking [him]." (ECF No. 114-4, p. 47; ECF No. 114-7, pp. 83–84). The group slammed into a cigarette vending machine by the door—which Sholtis attempted to grab—before tumbling out the door and into the parking lot just shy of 1:15 AM. (ECF No. 104-22, 14:49–14:53; ECF No. 104-21, 0:20).

Meanwhile, Bouncer Two followed closely behind his colleagues and joined the final physical effort to remove Sholtis from the lobby. (ECF No. 104-22, 14:49–14:53). Sergeant Turko also trailed behind, watching the altercation but making no physical contact with Sholtis while inside the lobby. (*Id.* at 14:45–14:53). Additionally, an unidentified man in a business suit—presumably a club manager—joined the mix and exited out the door behind Sergeant Turko. (ECF

---

[3] From this point on, the security footage becomes more difficult to decipher due to the sheer number of persons involved, the limited camera angles, and the grainy quality of the video captured by the outdoor camera.

No. 104-22, 14:50–14:55).  Sholtis's brother, Friend One, and Friend Two also observed the action in the lobby[4]—engaging in some minor shoving and brief physical contact with Bouncer Two, Sergeant Turko, and the manager—and then followed everyone through the exit.  (ECF No. 104-22, 14:45–15:00).

Things took a turn for the worse outside.  At least eight different men became caught up in a scrum just outside the front door on a ramp to the parking lot—including Sholtis, Sergeant Turko, the three bouncers, the manager, Sholtis's brother, and Friend One.  (ECF No. 104-21, 0:21–0:28).  The group pushed and shoved each other, with Sholtis struggling in the middle.  (*Id.*).  As they surged down the ramp, Sholtis reached out to grab a pole to prevent himself from "get[ting] slammed [to] the ground."  (*Id.* at 0:22–0:24; ECF No. 114-4, p. 50).  At that point, as the group's forward momentum stalled, Sergeant Turko can be seen at the outer edge of the scrum pulling the taser from his utility belt near his left hip and then quickly passing it to his right hand.  (ECF No. 104-21, 0:23–0:26; ECF No. 114-7, p. 67).

After a few seconds, Sholtis managed to pull away from the group, and the men began to separate.  (ECF No. 104-21, 0:30–0:32).  Sholtis was quickly joined by Friend One and Friend Two, who urged and pushed him to the bottom of the ramp, away from the front door.  (*Id.* at 0:32–0:40).  The three bouncers walked in the opposite direction to the top of the ramp.  (*Id.*).  And remaining in the middle were Sergeant Turko and the manager (with their backs to the bouncers) and Sholtis's brother (with his back to Sholtis and the friends).  (*Id.* at 0:40).  This standoff did not last long.  Sholtis shoved at his friends in an apparent effort to get past them.  (*Id.* at 0:37–0:44).

---

[4] By this time, Friend Three had already removed himself from the situation entirely.  He exited the building as soon as the bouncers first made physical contact with Sholtis in the lobby and then slowly walked away in the parking lot.  (ECF No. 104-22, 14:45; ECF No. 104-20, 0:13; ECF No. 104-21, 0:13–0:24).  He does not reappear in any later security footage.

Observing this, Sergeant Turko sidestepped Sholtis's brother and walked down the ramp. (*Id.* at 0:41–0:44). Sholtis likewise bypassed his friends and came a few steps back up the ramp to meet Sergeant Turko. (*Id.* at 0:43–0:45). It is at this time, and over the next several seconds, that Sergeant Turko twice deployed his taser against Sholtis. Not much can be discerned from the video itself—at least without some descriptive context. The parties, however, offer competing versions of events.

According to Sergeant Turko, he observed Sholtis—who was "extremely large and muscular" and "appeared to be intoxicated"—"violently try[ing] to push his way back into the club." (ECF No. 104-6, p. 3; ECF No. 114-7, pp. 74–75). Sergeant Turko told Sholtis to leave the property, but Sholtis seemed "enraged" and "very unstable," "hurling insults and yelling threats." (ECF No. 114-7, pp. 75, 90). Sholtis then "lung[ed] towards" Sergeant Turko with "his fists . . . clenched." (ECF No. 104-6, p. 3; ECF No. 114-7, p. 76). Sergeant Turko believed that the "altercation was going to spiral out of control" and that he could not stop Sholtis without "using a lot of force." (ECF No. 104-6, p. 3). He thus deployed his taser in 'probe mode' at 1:15:15 AM, "fir[ing] it from [his right] hip because [he] was trying to be quick." (ECF No. 114-7, p. 77; ECF No. 104-6, p. 3; ECF No. 104-7, pp. 2, 4, 7). It was unsuccessful, however, as only one of the two probes made contact with Sholtis. (ECF No. 114-7, p. 77; ECF No. 104-6, p. 3). Sholtis yelled in disbelief, "You tased me!" and appeared "engrage[d] . . . even more." (ECF No. 104-6, p. 3; ECF No. 114-7, pp. 77, 86). Sergeant Turko told Sholtis that he was under arrest. (ECF No. 104-6, p. 3; ECF No. 114-7, p. 86). But Sholtis apparently "continued towards" Sergeant Turko, and at 1:15:24 AM, he deployed the taser in 'drive stun' mode, applying it directly against Sholtis's torso. (ECF No. 104-6, p. 3; ECF No. 114-7, p. 77; ECF No. 104-7, pp. 3–4, 7). In doing so, Sergeant Turko sought to "finish what [he] had attempted but failed the first time" by "connect[ing] . . . the

circuit" and causing neuromuscular incapacitation ("NMI").  (ECF No. 114-7, p. 77).  This time it was successful, and Sholtis dropped to the ground.  (ECF No. 104-6, p. 3).  As Sergeant Turko leaned over Sholtis's body to handcuff him, he was "somewhat compliant, but still making threats and screaming." (ECF No. 104-6, p. 3; ECF No. 114-7, pp. 73–74).

Sholtis tells a slightly different story.  He acknowledges that he is "a muscular guy," standing at six feet, two inches and weighing about 250 pounds.[5]  (ECF No. 114-4, pp. 82, 84).  He also admits to consuming "three vodka and Red Bulls" between approximately 7:00 PM and 12:00 AM.  (*Id.* at 31).  But contrary to Sergeant Turko's recitation, Sholtis asserts that he is "a very nonviolent person."  (*Id.* at 48).  He states that he "would have loved to have just l[eft Cheerleaders], but [he] wasn't given the opportunity" before being "physically assaulted" by the bouncers. (*Id.* at 46–47).  Once outside, his adrenalin was pumping because he was "just attacked" after "d[oing] nothing wrong," and his friends tried to calm him down.  (*Id.* at 50–51).  Sholtis did not retreat any further because he had not driven himself to the club and did not want to walk into a city that he did not know.  (*Id.* at 65).  Moreover, Sholtis "want[ed] to understand" why he was "attacked."  (*Id.* at 65).  He claims that he never "tr[ied] to go back inside [Cheerleaders]."  (*Id.* at 64).  Rather, he noticed a police officer—Sergeant Turko—and wanted to "tell him about [the altercation]," thinking that he could "probably help."  (*Id.* at 66, 75–76).  But Sergeant Turko suddenly fired his taser at Sholtis.  (*Id.* at 63).  Only one of the probes hit Sholtis's pinky finger, and the other hit the ground, "so it didn't work."  (*Id.*).  Sholtis asked, "[W]hy did you just tase me?" and told Sergeant Turko that he was "not a threat to anybody."  (*Id.*).  Sergeant Turko, however, "looked [Sholtis] right in the eye and took the taser and . . . hit [him] right in the heart

---

[5] For comparison, Sergeant Turko is five feet, eleven inches tall and weighs 180 pounds.  (ECF No. 114-7, p. 61).

with it," "render[ing him] unconscious." (*Id.*).  When Sholtis came to, he was on the ground being handcuffed.  (*Id.*).[6]

The video footage of these critical seconds offers little clarity, as it is soundless and grainy, it lacks a time stamp, and key events are not visible due to the camera angle.  (ECF No. 104-21, 0:43–0:53).  It is near-impossible to pin-point precisely when Sergeant Turko first deployed the taser in 'probe mode.'  Sergeant Turko held the taser in his right hand, but the camera captured only his left-hand side.  Thus, Sergeant Turko's own body blocks the view of the initial trigger pull.  As such, the video does not reveal whether Sergeant Turko pulled the trigger as Sholtis walked toward him (and if so, at what distance) or only after Sholtis came to a stop about an arm's length away.  (*Id.* at 0:43–0:48).  And although Sholtis can be seen lurching back at one point, it is unclear whether he did so in response to being hit with the probe or because his friends yanked him back.  (*Id.* at 0:46–0:48).  Sholtis is then blocked from view by Friend Two, making it impossible to discern whether Sholtis simply stood in place while expressing disbelief at being tased, or whether he moved back toward Sergeant Turko.  (*Id.* at 0:48–0:49).  Sholtis remains almost entirely blocked by his friend during these seconds, indicating that if he made any sort of movement forward, it was incredibly minor.  Finally, Sergeant Turko can be seen surging forward with his arm outstretched to drive stun Sholtis in the chest.  (*Id.* at 0:49–0:50).  Sholtis drops to the ground and does not appear to move for about five seconds.  (*Id.* at 0:50–0:55).

---

[6] According to Friend One, Sholtis "never clenched his fists" or made "any threatening remarks." (ECF No. 114-6, ¶¶ 13–14).  Rather, Sholtis kept asking, "Why are you doing this to me?" and said, "I am not a threat!"  (*Id.* ¶¶ 11–12).  Moreover, Friend One maintains that Sergeant Turko never told Sholtis to leave the premises or that he was under arrest and never gave any warnings about a taser.  (*Id.* ¶¶ 16, 20–21).  Friend One recalls Sergeant Turko having "very little dialogue during the entire incident," except for repeatedly telling the men to "[s]hut the fuck up!" (*Id.* ¶ 22).

After his arrest, Sholtis was taken to the hospital before being transported to the Allegheny County Jail. (ECF No. 114-4, pp. 80, 85). An emergency room doctor described Sholtis as "pleasantly intoxicated" and found that he had "a minor abrasion to his chest" from the taser. (ECF No. 114-2, p. 136). Sholtis was subsequently charged with multiple offenses, but, following a bench trial in 2018 in the Court of Common Pleas of Allegheny County, Pennsylvania, he was ultimately convicted of only the summary offense of disorderly conduct, *see* 18 Pa. C.S. § 5503(a)(1). (ECF No. 114-2, pp. 103–104, 106; ECF No. 114-3, p. 253). In 2019, Sholtis filed the present § 1983 action against Sergeant Turko and the City of Pittsburgh. (ECF No. 1).

## III.  ANALYSIS

### A.  Sergeant Turko is not entitled to qualified immunity.

In moving for summary judgment as to Count I, Sergeant Turko asserts that he is entitled to qualified immunity because he used reasonable force under the circumstances. (ECF No. 99; ECF No. 100, p. 13). Qualified immunity shields government officials, including police officers, from liability for civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). To determine whether qualified immunity applies in this case, the Court must conduct a two-part inquiry, considering (1) whether Sergeant Turko violated a constitutional right and (2) whether that right was clearly established. *See El v. City of Pittsburgh*, 975 F.3d 327, 334 (3d Cir. 2020); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (affording courts discretion to decide which step of the qualified immunity analysis to address first). Sergeant Turko has the burden of establishing his entitlement to qualified immunity. *See Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). Taking the facts in the light most favorable to Sholtis, the Court

holds that a reasonable jury could find that Sergeant Turko violated Sholtis's Fourth Amendment right to be free from excessive force, and that such a right was clearly established at the time of the incident.  Accordingly, Sergeant Turko is not protected by qualified immunity.

### 1. A reasonable jury could find that Sergeant Turko violated Sholtis's Fourth Amendment right to be free from excessive force.

The first step of the qualified immunity analysis asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Sholtis asserts that Sergeant Turko used excessive force in violation of the Fourth Amendment, as applied to the states by the Fourteenth Amendment.[7]  Excessive force claims under the Fourth Amendment require proof that "a seizure occurred and that it was unreasonable under the circumstances."  *El*, 975 F.3d at 336 (citation omitted); *see also Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999).  Sergeant Turko does not dispute that a seizure occurred here, and nor could he.  Sergeant Turko seized Sholtis within the meaning of the Fourth Amendment when he tased and drive stunned him—an "application of physical force to the body of a person with intent to restrain."  *Torres v. Madrid*, 141 S. Ct. 989, 994 (2021).  However, Sergeant Turko maintains that this use of force was reasonable.

---

[7] Sholtis brings this claim under 42 U.S.C. § 1983, which provides a cause of action "for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citation omitted).  To obtain relief under § 1983, a plaintiff must show that he suffered "the violation of a right secured by the Constitution and laws of the United States" and that "the alleged deprivation was committed by a person acting under color of state law."  *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).  As to the latter showing, there is no dispute that Sergeant Turko acted under color of state law while performing approved off-duty police work in full uniform at Cheerleaders.  *See Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3d Cir. 1994) ("[O]ff-duty police officers who purport to exercise official authority will generally be found to have acted under color of state law.").  The Court's analysis thus focuses on the former showing—the violation of a constitutional right—which dovetails with the first step of the qualified immunity inquiry.

A challenged use of force is "evaluated for objective reasonableness based upon the information the officer[] had when the conduct occurred." *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017) (quoting *Saucier*, 533 U.S. at 207); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). In determining the objective reasonableness of a particular use of force, courts may consider several factors, including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to officer or public safety; (3) whether the suspect is actively resisting or attempting to evade arrest; (4) physical injury to the suspect; (5) whether the suspect is violent or dangerous; (6) the duration of the use of force; (7) whether the use of force takes place in the context of effecting an arrest; (8) the possibility that the suspect may be armed; and (9) the number of people with whom the officers must contend at one time. *See Graham*, 490 U.S. at 396 (setting forth factors one through three); *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (setting forth factors four through nine); *see also El*, 975 F.3d at 336. Considering those factors and viewing the facts in the light most favorable to Sholtis, a jury could conclude that Sergeant Turko's use of force was objectively unreasonable.

As to the first factor, Sholtis was not suspected of any independent crime—that is, a crime separate and apart from his interactions with the bouncers and Sergeant Turko at Cheerleaders. Even considering those interactions, Sergeant Turko has admitted that the "pushing and shoving" that he observed between Sholtis and the bouncers did not reach the level of "an actual assault" or an "arrestable" offense. (ECF No. 114-7, pp. 85, 89). Although Sholtis was later convicted of the summary offense of disorderly conduct, that is not a particularly violent or serious crime. *See Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (concluding that the "crime[]

of disorderly conduct" is not "particularly severe"). Moreover, "even if an individual is engaged in disorderly conduct, there still could be a level of responsive force that is . . . 'excessive and unreasonable.'" *El*, 975 F.3d at 339 (citation omitted). Consequently, this factor weighs in favor of Sholtis, as a jury could find Sergeant Turko's use of force to be disproportionate to the nonserious nature of the suspected crime.

With regard to the second factor, there is a genuine dispute as to whether Sholtis posed an immediate threat at the time of the tasing. As discussed above, the security footage is of little help. It is impossible to discern whether Sergeant Turko deployed the taser in 'probe mode' as Sholtis moved toward him (and if so, at what distance) or only after Sholtis stopped about an arm's length away. (ECF No. 104-21, 0:43–0:48). Moreover, the video does not reveal whether Sholtis simply stood in place after being hit with the probe and before being drive stunned, or whether he made a minor movement back toward Sergeant Turko. (*Id.* at 0:48–0:49). The Court is thus left with competing stories from Sergeant Turko and Sholtis. Sergeant Turko says that he first pulled the trigger as Sholtis (a physically larger man) lunged toward him, fists clenched and yelling threats; that Sholtis appeared enraged by the initial tasing; and that he told Sholtis he was under arrest, but Sholtis continued to move toward him, prompting the drive stun. Sholtis, however, maintains that he walked to meet Sergeant Turko (who had already started walking toward him) without clenching his fists or making any threats, seeking the help of a police officer; that Sergeant Turko suddenly and with no warning attempted to tase him; and that Sergeant Turko never told him he was under arrest before drive stunning him in the chest. That drive stun, moreover, occurred a full nine seconds after the initial trigger pull, suggesting that Sergeant Turko was not "forced to make [a] split-second judgment[]," *Graham*, 490 U.S. at 397, in response to an immediate threat. These are "material issues of disputed fact and credibility determinations that cannot be decided on a

13

motion for summary judgment," but must instead be resolved by a jury. *Groman*, 47 F.3d at 634. A jury could determine that Sholtis did not present an immediate threat to Sergeant Turko's safety or any other person's safety, either at the time of the initial trigger pull or the drive stun. Accordingly, factor two weighs in favor of Sholtis.

There is also a genuine dispute as to the fifth factor, whether Sholtis was violent or dangerous. Certain evidence suggests the affirmative—i.e., that a reasonable officer in Sergeant Turko's position could have viewed Sholtis as violent or dangerous. Prior to the tasing, Sergeant Turko observed Sholtis pushing and shoving the bouncers and his friends. Moreover, it took multiple men to physically remove Sholtis from the lobby of the club. But the record also supports the opposite conclusion. The security footage reveals that Sergeant Turko arrived in the lobby in time to see that Sholtis was not the first aggressor; rather, the bouncers initiated the physical altercation. Sholtis then engaged in mild pushing and shoving in an effort to free himself from the bouncers, but he never threw any punches or kicks, as Sergeant Turko admits. There was also a brief separation in both time and place between the altercation with the bouncers and the tasing— what Sergeant Turko calls "a lull in the action." (ECF No. 114-7, p. 90). Sholtis was therefore not engaged in any violent act at the time of Sergeant Turko's use of force.[8] Based on the conflicting inferences that can be drawn from the record evidence, there is a genuine dispute as to whether Sholtis was violent or dangerous. Since a jury could find that Sholtis was not violent or dangerous, factor four weighs in favor of Sholtis.

---

[8] The video footage contradicts Sergeant Turko's assertion that Sholtis was "violently try[ing] to push his way back into the club." (ECF No. 104-6, p. 3). After escaping the scrum with the bouncers, Sholtis at all times remained near the bottom of the ramp, a good distance away from the front door where the bouncers and some bystanders were congregating. A jury could therefore find that Sholtis was not violently trying to reenter the club at the time of the tasing and that he did not pose a threat to any other persons at Cheerleaders that night.

Next, the Court considers factors three and seven, which ask whether the use of force took place in the context of effecting an arrest and, if so, whether Sholtis actively resisted arrest. It is undisputed that Sergeant Turko did not attempt to place Sholtis under arrest prior to deploying the taser in 'probe mode.' As such, the initial trigger pull did not occur in the context of an arrest. However, the parties dispute what came next. Sergeant Turko claims that he told Sholtis that he was under arrest before drive stunning him. But Sholtis denies that Sergeant Turko made any such statement. And even if he did, Sergeant Turko has admitted that Sholtis was not "actively resisting anything" during this time.[9] (ECF No. 114-7, p. 73). The third and seventh factors thus clearly favor Sholtis, as a jury could find that the initial tasing did not take place in the context of an arrest and that Sholtis did not actively resist arrest prior to the drive stun. Moreover, from a broader

---

[9] During his deposition, Sergeant Turko testified as follows in response to questions by Sholtis's counsel:

Q.   Is it your contention that Kyle Sholtis was actively resisting anything?
A.   No, not initially, no.
Q.   Was there ever a point in time that you would contend that Kyle Sholtis began actively resisting?
A.   Yeah. At the end, whenever I was trying to handcuff him, he was kind of pulling away from me a little bit.
Q.   When -- is that before or after the tasing?
A.   It's after the tasing.
Q.   Okay.
A.   Prior to that, he was verbally noncompliant, but I wasn't telling him he was under arrest just yet then either.
Q.   You only told him that he was under arrest after you tased him, right?
A.   Right.

(ECF No. 114-7, pp. 73–74). The Court notes that it is uncertain what the parties mean by "after the tasing" and "after you tased him"—i.e., after the initial trigger pull or after the drive stun? The reference to Sholtis being handcuffed, which occurred after the entire tasing incident, suggests that Sergeant Turko meant 'after the drive stun' by "after the tasing." But elsewhere Sergeant Turko has asserted that he informed Sholtis that he was under arrest prior to the drive stun. (ECF No. 104-6, p. 3; ECF No. 114-7, p. 86). To the extent that Sergeant Turko testified consistently, he might have understood "after you tased him" to mean 'after the initial trigger pull.' Nevertheless, it is clear that Sholtis did not actively resist arrest prior to when he was on the ground being handcuffed.

perspective, there is a genuine dispute as to whether Sergeant Turko ever gave Sholtis *any commands* to which he was noncompliant, aside from the command to "[s]hut the fuck up!" (ECF No. 114-6, ¶ 22). Mere noncompliance uncoupled from "something more," such as "a verbal showing of hostility" or "a deliberate act of defiance," does not constitute active resistance. *Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015) (citation omitted). Since Sholtis denies ever making any verbal threats, a jury could find that, in addition to not actively resisting arrest, Sholtis did not actively resist any commands from Sergeant Turko throughout the encounter. This additional consideration weighs in Sholtis's favor.

With regard to factor four—physical injury to Sholtis—the Court necessarily considers the nature of the force used. "Although the deployment of a taser is not normally fatal, it remains a relatively serious use of force." *Ickes v. Borough of Bedford*, 807 F. Supp. 2d 306, 323 (W.D. Pa. 2011); *see also Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010) (noting that a taser "sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain"); Pittsburgh Bureau of Police Use of Force Training 2016 (ECF No. 106-1, p. 27) ("TASER [Conducted Electrical Weapons] are serious weapons and are to be treated as such at all times."). Sergeant Turko deployed his taser in both 'probe mode' and 'drive stun mode.' The former mode was unsuccessful, as only one of the probes struck Sholtis's hand. But by drive stunning Sholtis, thereby placing the electrodes of the taser directly against Sholtis's chest, Sergeant Turko completed the circuit. The drive stun thus delivered an electrical charge that caused NMI—which, according to Sholtis, briefly rendered him unconscious—rather than just inflicting the "localized pain" normally associated with 'drive stun mode.' (ECF No. 106-1, p. 63). Sholtis also suffered "a minor abrasion to his chest" from the drive stun. (ECF No. 114-2, p. 136; ECF No. 106-4). Of note, Pittsburgh police officers are trained to "[a]void intentionally targeting

the [taser] on sensitive areas of the body such as the . . . chest or area of the heart . . . ." (ECF No. 106-1, p. 61). Yet the video footage and medical evidence make clear that just such a targeting occurred here. Moreover, officers are trained to "[g]ive a verbal warning" before deploying their tasers, where possible. (*Id.* at 52). Yet no warning was given in this case. Considering this evidence and the serious nature of the force used, a jury could find that Sholtis suffered a physical injury. The fourth factor therefore weighs in favor of Sholtis.

The remaining three factors are straightforward. Factor six weighs in favor of Sergeant Turko since the duration of each taser deployment was only five seconds—the standard period of electrical discharge for every trigger pull. (ECF No. 104-7, p. 7; ECF No. 106-1, p. 33). Factor eight, however, weighs in favor of Sholtis, as there has never been any allegation in this case that Sholtis may have been armed. Factor nine likewise weighs in favor of Sholtis: Sergeant Turko only had to contend with one person, Sholtis himself. That is so because Sholtis's friends and brother cannot be viewed as 'teaming up' with Sholtis against Sergeant Turko prior to the use of force; rather, those individuals repeatedly endeavored to calm Sholtis down.

Weighing all of these factors together, and upon consideration of the totality of the circumstances, the Court holds that a jury could determine that Sergeant Turko's use of force was objectively unreasonable. Accordingly, a jury could find that Sergeant Turko violated Sholtis's Fourth Amendment right to be free from excessive force.

### 2. The constitutional right was clearly established at the time of Sergeant Turko's use of force.

The second step of the qualified immunity inquiry asks whether "the [constitutional] right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818). To answer that question, the Court must first "define the right allegedly violated at the appropriate level of specificity." *Peroza-Benitez*, 994

F.3d at 165 (citation omitted); *see also El*, 975 F.3d at 338 ("[T]he right must be defined with specificity."). The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742; *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (stating that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition" (citation omitted)). This is "especially important in the Fourth Amendment context." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). Thus, the "general proposition" established by *Graham*—i.e., that "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness"—is not "particularized" enough. *Saucier*, 533 U.S. at 201–02; *see also al-Kidd*, 563 U.S. at 742. The specific Fourth Amendment right at issue in this case is the right of an individual not to be tased when he is not suspected of a serious crime, he does not pose an immediate threat, and he is not actively resisting arrest. Sergeant Turko, of course, disputes those characterizations. But they are drawn from the record evidence, viewed in the light most favorable to Sholtis, as is required at the summary judgment stage. *See Peroza-Benitez*, 994 F.3d at 166–67.

The Court next considers whether the specific right was clearly established as of May 28, 2017, the date of the challenged use of force. A right is clearly established if it would be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Wesby*, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202). There need not be "a case directly on point" for a right to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741; *see also Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004) (stating that the Third Circuit takes "a broad view of what constitutes [a clearly] established right" and that it may be established even without a "'precise factual correspondence' between the case at issue and a previous case" (citations omitted)). Existing

18

precedent includes "controlling authority" from the Supreme Court and the Court of Appeals for the Third Circuit, as well as "a robust consensus of cases of persuasive authority" from other Courts of Appeals. *Wesby*, 138 S. Ct. at 589–90 (citations and internal quotation marks omitted); *see also Peroza-Benitez*, 994 F.3d at 165; *El*, 975 F.3d at 339.  The Court "may also take into account district court cases, from within the Third Circuit or elsewhere." *Peroza-Benitez*, 994 F.3d at 165–66.

Upon review of then-existing precedent, the Court holds that the right at issue in this case was clearly established at the time of Sergeant Turko's use of force.  First, as a general matter, it has been long established that "force may not legitimately be used against an individual who is compliant and poses no ongoing threat to himself or others, or who is not resisting arrest, even if he was initially non-compliant." *Anthony v. Seltzer*, 696 F. App'x 79, 82 (3d Cir. 2017).[10]  That principle, moreover, "extends to the use of Tasers." *Id.*  Numerous cases have recognized that individuals have a right not to be tased when they are not actively resisting arrest, do not pose an immediate safety threat, and are not suspected of a serious crime. *See, e.g.*, *Wright v. City of Euclid*, 962 F.3d 852, 870 (6th Cir. 2020) (holding, as of November 2016, that "there is a clearly established right not to be tased when the suspect is not actively resisting arrest"); *Yates v. Terry*, 817 F.3d 877, 885–88 (4th Cir. 2016); *Ramirez v. Martinez*, 716 F.3d 369, 378–79 (5th Cir. 2013); *Abbott v. Sangamon County*, 705 F.3d 706, 729–33 (7th Cir. 2013); *Shekleton v. Eichenberger*, 677 F.3d 361, 366–67 (8th Cir. 2012); *Mattos v. Agarano*, 661 F.3d 433, 449–51 (9th Cir. 2011) (en banc); *Fils v. City of Aventura*, 647 F.3d 1272, 1288–90, 1292 (11th Cir. 2011); *Bryan v.*

---

[10] The Court recognizes that "unpublished cases, which are not binding, cannot establish a right." *El*, 975 F.3d at 340–41.  Thus, the Third Circuit's nonprecedential decision in *Anthony* does not itself establish this right.  But it does confirm the clear establishment of the right, prior to November 2013, by controlling precedent in other circuits. *See Anthony*, 696 F. App'x at 82 (citing several precedential opinions from the Courts of Appeals).

*MacPherson*, 630 F.3d 805, 826–32 (9th Cir. 2010); *Cavanaugh*, 625 F.3d at 665–67; *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009); *Casey v. City of Federal Heights*, 509 F.3d 1278, 1285–86 (10th Cir. 2007); *cf. Peroza-Benitez*, 994 F.3d at 171–72 (holding that "the right not to be tased while visibly unconscious" was clearly established as of October 2015). Those cases constitute "a robust consensus . . . of persuasive authority," such that, under the particular circumstances in this case, "every reasonable official would have understood that what he is doing violates that right."[11] *al-Kidd*, 563 U.S. at 741–42 (citations and internal quotation marks and brackets omitted). In other words, the Fourth Amendment right of an individual not to be tased when he is not suspected of a serious crime, does not pose an immediate threat, and is not actively resisting arrest was clearly established as of May 2017.

A reasonable jury could therefore find that Sergeant Turko violated a clearly established right. As such, Sergeant Turko is not entitled to qualified immunity, and the Court will deny his Motion for Summary Judgment (ECF No. 99) as to the excessive force claim at Count I.

### B. Sholtis has not presented sufficient evidence to show that the City of Pittsburgh has a custom of authorizing the use of excessive force.

The City of Pittsburgh moves for summary judgment on Count II on the ground that Sholtis has failed to establish municipal liability. (ECF No. 99; ECF No. 100, p. 14). A municipality is only liable under § 1983 for "constitutional violations that are caused by its official policies and customs." *Porter v. City of Philadelphia*, 975 F.3d 374, 383 (3d Cir. 2020); *see also Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy [or custom] of some nature caused a constitutional tort. . . . [A] municipality cannot be held liable under § 1983 on

---

[11] Indeed, Sergeant Turko himself understood that, absent some indication of possible self-harm or a physical threat to the officer, tasers "should only be used on those actively resisting or higher." (ECF No. 114-7, pp. 71–72).

a *respondeat superior* theory.").  As an initial matter, then, a plaintiff alleging municipal liability must identify and adduce evidence of a municipal policy or custom.  *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  A policy exists when a "'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict."  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)); *see also Monell*, 436 U.S. at 690.  A custom arises when "a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."  *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citation omitted); *see also Monell*, 436 U.S. at 690–91. One way to establish a custom is through "evidence of knowledge and acquiescence"—that is, evidence "that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations."  *Beck v. City of Pittsburgh*, 89 F.3d 966, 971–72 (3d Cir. 1996) (citation omitted).

"[P]roof of the existence of an unlawful policy or custom alone is insufficient to maintain a § 1983 action."  *Beck*, 89 F.3d at 972 n.6.  The plaintiff must additionally prove that the policy or custom was "the proximate cause of the injuries suffered."  *Id.*  In other words, a plaintiff must "demonstrate[e] an 'affirmative link' between the policy or custom and the particular constitutional violation."  *Est. of Roman*, 914 F.3d at 798 (citation omitted); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. at 404 ("The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.").

In this case, Sholtis asserts that the City of Pittsburgh has a custom of permitting its police officers to use excessive force against citizens, thereby facilitating Sergeant Turko's use of force

against Sholtis.[12]   He relies on several pieces of evidence.  First, he points to a record from the Pittsburgh Bureau of Police showing that only eleven police officers were disciplined between 2010 and 2020.  (ECF No. 114-24).  Second, he presents a record from the City of Pittsburgh's Office of Municipal Investigations ("OMI") demonstrating that, between 2009 and 2019, only 10 of 509 civilian complaints against police officers regarding use of force were sustained— approximately 1.9 percent.  (ECF No. 114-27).  Third, Sholtis provides the OMI report regarding the complaint that he filed against Sergeant Turko following the tasing incident.  (ECF No. 114-2). That report explains that, after an investigation, OMI exonerated Sergeant Turko of using excessive force against Sholtis.  (*Id.* at 12).  Moreover, attached to the report is a brief summary of twelve previous complaints filed against Sergeant Turko between 2003 and 2017.  (*Id.* at 123– 34).   Those complaints included eight allegations of excessive force: Sergeant Turko was exonerated of one; another four were determined to be unfounded; and the remaining three were not resolved.  (*Id.*).  Fourth, and finally, Sholtis identifies a few recent lawsuits against Pittsburgh police officers, including two against Sergeant Turko.  (ECF No. 113, ¶¶ 110, 119, 123, 124).[13]

Armed with that evidence, Sholtis analogizes this case to *Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996).  (ECF No. 112, p. 11).  In *Beck*, the plaintiff asserted that a Pittsburgh police officer "engaged in police brutality and used excessive force against him while making an arrest" in 1993 and that the City of Pittsburgh had a "custom of tacitly authorizing its police officers to use excessive force."  89 F.3d at 967.  As to the municipal liability claim, the Third

---

[12] At oral argument, Sholtis clarified that he is not relying on a failure-to-train theory of municipal liability.

[13] *See Kopy v. Martin*, No. 20-cv-00558 (W.D. Pa. 2020); *Adelman v. City of Pittsburgh*, No. 18- cv-00607 (W.D. Pa. 2018); *Williams v. City of Pittsburgh*, No. 15-cv-00402 (W.D. Pa. 2015); *Kenney v. City of Pittsburgh*, No. 12-cv-00551 (W.D. Pa. 2012).

Circuit reversed the district court's grant of judgment as a matter of law in favor of the City, holding that the plaintiff "presented sufficient evidence from which a reasonable jury could have inferred that the City of Pittsburgh knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers." *Id.* at 976. Specifically, the plaintiff in *Beck* introduced evidence showing that the Office of Professional Standards ("OPS")—the predecessor to OMI— sustained only 3.4 percent of use of force complaints between 1990 and 1994. *Id.* at 970. In addition, the plaintiff "presented considerably more than mere statistics." *Id.* at 975. He also "presented evidence of actual written civilian complaints"—that is, the reports of five complaints of excessive force against the defendant police officer between 1990 and 1994, none of which were sustained or resulted in any discipline. *Id.* at 969–70, 975. Those reports contained "specific information" showing that the complaints were "of similar nature" to the challenged use of force in *Beck*, involving allegations that the defendant officer engaged in verbal and physical abuse while arresting citizens. *Id.* at 969–70, 973. Moreover, the complaints "came in a narrow period of time." *Id.* at 973. The Third Circuit thus concluded that a jury could have found that the City of Pittsburgh knew of the defendant officer's "propensity for violence when making arrests," but never took any steps to discipline or retrain him. *Id.*

Additionally, the plaintiff in *Beck* presented significant evidence concerning OPS's investigative process. The Third Circuit identified several flaws with OPS's "sterile and shallow . . . system of investigation," *id.*: (1) OPS had no formal mechanism to track complaints against individual officers and thus could not report patterns of cases to the Bureau of Police, *id.* at 969, 974; (2) OPS viewed each complaint in a vacuum and did not consider prior complaints against the officer in question, *id.* at 969, 973; and (3) OPS gave "special, favorable consideration" to the testimony of police officers, but "attached no credibility . . . to the complainant's witnesses if they

accompanied the complainant at the time of the incident," *id.* at 973–74. Based on that evidence, the court determined that a jury could have found that OPS "was nothing more than a facade to cover the violent behavioral patterns of police officers under investigation, to protect them from disciplinary action, and thereby perpetuate the City's custom of acquiescing in the excessive use of force by its police officers." *Id.* at 974.

Having described in detail the evidence in *Beck* and having carefully reviewed Sholtis's evidence, the Court concludes that the present case is distinguishable for two reasons. First, the limited evidence in the record concerning OMI's operations reveals that the City of Pittsburgh has, at some point over the past two decades, corrected all of the identified flaws found in the predecessor organization, OPS. Specifically: (1) OMI utilizes an electronic database to track civilian complaints, and it is possible to generate a summary of all complaints against an individual officer; that summary, moreover, is attached to the final report, which is sent to the Bureau of Police (ECF No. 114-26, pp. 12–13, 18; ECF No. 114-2, pp. 123–34); (2) OMI considers prior complaints when evaluating a new complaint against an officer (ECF No. 114-2, pp. 8,123–34); and (3) OMI deems all parties to be equally credible unless there is evidence diminishing that credibility (ECF No. 114-26, pp. 59–60). Thus, a jury could not find, as it could in *Beck*, that OMI is "structured to curtail disciplinary action and stifle investigations." 89 F.3d at 974.

Second, although Sholtis has presented a summary report of Sergeant Turko's prior use of force complaints (ECF No. 114-2, p. 123, 128–30, 132–33), that evidence does not have the same effect as the "actual written civilian complaints" against the defendant officer in *Beck*. 89 F.3d at 975. That is so because the prior complaints against Sergeant Turko were not "of similar nature" to the challenged use of force at Cheerleaders—i.e., none involved the use of a taser. *Id.* at 973. Moreover, they did not occur in the same "narrow period of time" as the Cheerleaders incident.

*Id.* Rather, all but one occurred more than ten years prior, between 2004 and 2007; and the single close-in-time complaint, filed in January 2017, concerned a very dissimilar allegation (namely, that Sergeant Turko handcuffed the complainant too tightly). Considering those key distinctions, a jury could not reasonably make the same inference as in *Beck* that the City of Pittsburgh had knowledge of recent similar unlawful conduct but failed to take any action. Indeed, the ten-year gap in civilian complaints against Sergeant Turko supports the opposite inference: that the City *did* take some sort of action.[14]

In short, the primary types of evidence relied upon in *Beck*, including a deficient investigative system and recent complaints of a similar nature, are simply not present in this case or are materially distinct. What remains are "mere isolated events [and] mere statistics," *id.* at 973, that fall short of establishing "a municipal custom coupled with causation," *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). Sholtis points to the Bureau of Police's disciplinary record (ECF No. 114-24) and OMI's civilian complaint record (ECF No. 114-27), pressing the inference that too few officers were disciplined and too few complaints were sustained. But a reasonable jury could not draw that inference without additional evidence showing that more officers were deserving of discipline and more complaints should have been sustained. Absent that, there is simply no baseline upon which the bare numbers can be evaluated. *See Mariani v. City of Pittsburgh*, 624 F. Supp. 506, 511 (W.D. Pa. 1986) ("[M]ere recitation of the number of complaints filed [does not] suffice to prove a policy or custom. A plaintiff must show why those prior incidents deserved discipline and how the misconduct in those cases is similar to that involved in the present action."); *see also Strauss v. City of Chicago*, 760 F.2d 765, 768–69 (7th

---

[14] For example, Sergeant Turko testified at length about the use of force training he received each year. (ECF No. 114-7, pp. 33–46).

Cir. 1985) ("[T]he number of complaints filed, without more, indicates nothing.  People may file a complaint for many reasons, or for no reason at all."); *Merman v. City of Camden*, 824 F. Supp. 2d 581, 591 (D.N.J. 2010) ("Isolated and without further context, . . . statistical evidence alone may not justify a jury's finding that a municipal policy or custom authorizes or condones the unconstitutional acts of police officers.").

Sholtis also points to a few lawsuits against Pittsburgh police officers, including one suit where a jury found Sergeant Turko liable for using excessive force (specifically, pistol-whipping the plaintiff).  *See Kenney v. City of Pittsburgh*, No. 12-cv-00551, ECF No. 86 (W.D. Pa. July 16, 2014).  Sholtis argues that the City of Pittsburgh acquiesced in that use of force by failing to discipline Sergeant Turko and promoting him shortly thereafter.  (ECF No. 112, p. 12).  But "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*."  *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985); *see also Bingham v. Pittsburgh*, 658 F. Supp. 655, 660 (W.D. Pa. 1987) ("An isolated episode of a police officer using excessive force will not be sufficient to prove a pattern.").  And the remaining three lawsuits are likewise insufficient to support a finding of a widespread custom.  *See, e.g.*, *Gonzalez v. Borough of Red Bank*, 2020 WL 2029338, at *9–10 (D.N.J. Apr. 28, 2020); *Lawson v. City of Philadelphia*, 2020 WL 93941, at *4 n.3 (E.D. Pa. Jan. 8, 2020); *Pharaoh v. Dewees*, 2016 WL 2593842, at *5 (E.D. Pa. May 4, 2016).

In sum, considering all of the record evidence together and even viewing it in the light most favorable to Sholtis, the Court holds that a reasonable jury could not find that the City of Pittsburgh has a custom of permitting its officers to use excessive force and that that custom caused Sholtis's injury.  The Court will therefore grant the City of Pittsburgh's Motion for Summary Judgment (ECF No. 99) as to the municipal liability claim at Count II.

## IV.   CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (ECF No. 99) will be denied in part (as to Count I against Sergeant Turko) and granted in part (as to Count II against the City of Pittsburgh).  An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE